Filed 5/23/25  Koskiniemi v. Jennings CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KENNETH KOSKINIEMI et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> MICHAEL JENNINGS et al., <br><br> Defendants and Respondents. | F087348 <br><br> (Super. Ct. No. 21CECG03751) <br><br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  D. Tyler Tharpe, Judge.

Kasowitz Benson Torres, Jason S. Takenouchi; King & Spalding, Kellam McChesney Conover, Sarmad Khojasteh, and Ashley C. Parrish, for Plaintiffs and Appellants.

Jared Gordon, for Defendant and Respondent Michael Jennings.

Cozen O'Connor, Brett N. Taylor, Matthew E. Lewitz, and Alexander E. Robinson, for Defendants and Respondents Next Green Wave, NGW Holdings, LLC, Next Green Holdings Inc., Crossgate Capital US Holdings Corp., and Planet 13 Holdings Inc.

-ooOoo-

Plaintiffs Kenneth Koskiniemi and Micah-Luc Almeida appeal from a final judgment of dismissal entered after the trial court sustained defendants' demurrers as to all causes of action, without leave to amend. We conclude the trial court erred in sustaining defendants' demurrers. We therefore reverse the judgment of dismissal and remand the matter for further proceedings.

## PROCEDURAL BACKGROUND

Plaintiffs and appellants Kenneth Koskiniemi and Micah-Luc Almeida (plaintiffs) initiated this action on December 17, 2021, against the following defendants and respondents: (1) Michael Jennings and (2) Next Green Wave LLC, NGW Holdings, LLC, Next Green Wave Holdings Inc., and Crossgate Capital US Holdings Corp. (collectively, NGW defendants). Plaintiffs' complaint alleged seven causes of action against Jennings: breach of fiduciary duty; conversion; misappropriation of trade secrets; unjust enrichment; fraud; violation of the Unfair Competition Law (UCL); and constructive trust. The complaint further alleged six causes of action against the NGW defendants: aiding and abetting breach of fiduciary duty; aiding and abetting conversion; misappropriation of trade secrets; unjust enrichment; violation of the UCL; and constructive trust. Jennings and the NGW defendants filed demurrers on February 15, 2022. The trial court, on January 20, 2023, sustained the demurrers with leave to amend.

Plaintiffs filed a first amended complaint (FAC) on February 9, 2023.[1] The FAC realleged the same causes of action against Jennings and the NGW defendants as were alleged in the initial complaint. The FAC sought "actual, consequential, and compensatory damages" in the amount of $38 million, as well as injunctive relief to enjoin defendants from "continuing to use Plaintiffs' trade secrets in their business operations." Jennings and the NGW defendants then demurred to the FAC. On August 22, 2023, the trial court issued a tentative ruling sustaining the demurrers without leave to

___

[1] The FAC added one additional defendant, Planet 13 Holdings, Inc. We will use the collective term "NGW defendants" to include Planet 13, Holdings, Inc.

2.

amend.  The following day, the trial court heard argument from the parties.  On September 5, 2023, the court adopted its tentative ruling (without modification) as its final order and dismissed the FAC.  This appeal followed.

**THE FIRST AMENDED COMPLAINT**

The FAC indicates the dispute at issue in this case arose from a partnership that Koskiniemi, Almeida, and Jennings formed in relation to seeds for specific strains of marijuana that were developed or engineered by Almeida when he legally grew marijuana, in California, for medicinal purposes.  The FAC alleges that the partnership's primary objects were (1) to publicize and brand Almeida's seeds, and (2) to legally market the seeds in California, once adult recreational use of cannabis (and commercial sales) were legalized in the state.  The FAC alleges the partners intended for the partnership's activities to fully comport with applicable California laws.

More specifically, the FAC alleges:  "Almeida and Koskiniemi have been at the forefront of California's legal cannabis industry since California legalized the cultivation of medicinal marijuana in 1996 through the adoption of Proposition 215, the Compassionate Use Act.  After California enacted Senate Bill 420, The Medical Marijuana Program Act ('MMPA'), in 2004, qualified patients in the State could cultivate, deliver, transport, and possess cannabis pursuant to a doctor's recommendation.  Under that regulatory regime, individuals like Almeida, were permitted to obtain a doctor's recommendation to legally grow cannabis and develop proprietary cannabis strains using cross-breeding and genetic mapping."  The FAC adds:  "Other medical cannabis pioneers were using similar techniques [as Almeida] to develop their own proprietary strains during this time in California.  For example, the U.S. Patent and Trademark Office received applications for patents on proprietary cannabis strains developed by individuals in California as early as 2010, and issued the first plant patent on a cannabis strain in 2016 (based on a 2010 application.)"

3.

The FAC states: "In 2008, Almeida began managing a warehouse in Richmond, California, where, pursuant to Proposition 215, the Compassionate Use Act of 1996, and the MMPA, he legally grew various marijuana strains pursuant to a doctor's recommendation permitting him to grow cannabis legally. Almeida never sold any of the cannabis plants he grew or seeds he bred or otherwise profited from them." Almeida was permitted "to legally develop proprietary cannabis strains using cross-breeding and genetic mapping, including the strains at issue in this action." He "was meticulous to avoid running afoul of California's medical cannabis regulations, and also feared that [any] commercial sale and distribution of the seeds would extinguish the proprietary nature of the strains and breeds he developed."

The FAC notes: "Almeida selected new strains first based on disease resistance, then vigor, followed by aromatic and visual qualities." He "ultimately engaged Steep Hill labs in Berkeley, California, the state's first legal cannabis genetics lab, to map the genes of the parents as well as the new strains so that he could determine their genetic makeup with 100% accuracy." Koskiniemi "began growing at Almeida's warehouse," too. "By the late 2000s, Almeida and Koskiniemi were working together … growing innovative new strains as permitted under the MMPA, including 'Loud,' a remarkable strain known for its pungent smell and balanced flavor."

The FAC alleges, without specifying a date, that Almeida and Koskiniemi entered into an oral agreement to form a partnership named Loud Seeds. Through the partnership, "Almeida and Koskiniemi intended to sell Almeida's seeds after California legalized adult-use recreational cannabis, and only after obtaining the proper licenses from the State." The FAC notes: "Almeida would provide the seeds for the partnership and Koskiniemi would manage its operations and be the face of the partnership. The object, or purpose, of the partnership was to build the Loud Seeds brand around the proprietary cannabis seed strains and breeds legally developed by Almeida pursuant to Proposition 215 and the MMPA, and to monetize the intellectual property—the Loud

4.

Seeds brand and genetically-unique and proprietary seed strains Almeida developed—after California legalized adult-use cannabis. The partnership never engaged in any conduct intended to generate a profit from the cultivation or sale of cannabis plants or seeds prior to legalization of adult-use cannabis, nor did it ever contemplate doing so. Instead, the partnership at all times intended to operate in full compliance with California's applicable laws and regulations."

The FAC states: "Following the formation of their partnership under the Loud Seeds brand, Almeida and Koskiniemi continued innovating in genetics, creating new strains such as '7/8 Sour,' 'Loud Scout,' and 'Headband.' In total, Loud Seeds created a genetics portfolio that included more than 110 distinct seed types, which formed the basis for their business and their brand." The FAC reiterates: "Plaintiffs never engaged in for-profit commercial activity on behalf of Loud Seeds. Instead, all efforts on behalf of Loud Seeds exclusively were focused on developing the Loud Seeds intellectual property—namely, the Loud Seeds brand and the genetically-unique and proprietary seed strains developed by Almeida—in advance of the legalization of adult use cannabis in California after which time the partnership could legally monetize its intellectual property."

The FAC states:

> "Early on in their partnership, Koskiniemi inadvertently pollinated another grower's crop at the Richmond warehouse and needed to pay him to cover the losses. Lacking the full amount needed to pay the debt, Koskiniemi decided to bring in Jennings who paid off the remainder of the debt in exchange for becoming a member of the Loud Seeds partnership. No written partnership agreement was executed in connection with the agreement to bring Jennings into the business as a partner, but instead they came to an oral agreement. Among other things, Almeida, Koskiniemi, and Jennings would be co-owners of the business and that they would jointly share in the management of the partnership and any profits and losses the business would realize after California legalized adult use cannabis and the partnership was able to monetize its intellectual property—namely, the Loud Seeds brand and the genetically-unique and proprietary seed strains Almeida developed. Almeida and Koskiniemi's role did not materially change following Jennings joining the partnership, but Jennings took on certain financial and business operations as part of the preparation for the

5.

legalization of adult use cannabis in California.  Neither Jennings nor Plaintiffs ever engaged in for-profit commercial activity on behalf of Loud Seeds.  Instead, all efforts on behalf of Loud Seeds exclusively were focused on developing the Loud Seeds intellectual property—namely, the Loud Seeds brand and the genetically-unique and proprietary seed strains developed by Almeida—in advance of the legalization of adult use cannabis in California after which time the partnership could legally monetize its intellectual property."

The FAC notes that in 2012, "to obtain credibility in the European cannabis market, Loud Seeds set up a booth at the Amsterdam Cannabis Cup and entered Loud Seeds' leading hybrid strain—Loud Scout—into the hybrid competition."  "Loud Scout won top honors, taking home the prize for Top Hybrid."  "This win catapulted Loud Seeds to critical acclaim and resulted in an array of positive media that built momentum for the company."  "In 2013, Loud Seeds then entered another of its hybrids— Headband—in the Fourth Annual *High Times* Medical Cannabis Cup in San Francisco. Loud Seeds again came out on top, winning the Hybrid category as it had in the 2012 Cannabis Cup."

The FAC states:  "[I]n 2014, Loud Seeds was inducted into the '*High Times* Hall of Fame,' for its groundbreaking work in the cannabis industry.  Notwithstanding the public acclaim and media attention Loud Seeds received, and evidencing the fact that Loud Seeds never engaged in the illegal cultivation or sale of cannabis plants or seeds and that the Loud Seeds business was entirely legal, at no point did any federal, state, or local law enforcement agency ever contact anyone affiliated with Loud Seeds concerning the legality of its business."

Around that time, "Koskiniemi and Jennings agreed that they would run the seed business in Europe," and set up Loud Seeds SL in Spain and Loud Enterprise B.V. in the Netherlands.  "Loud Seeds never sold any of the seed strains that Almeida bred or designed.  Instead, Koskiniemi and Jennings legally purchased local seed strains and rebranded them under the Loud Seeds moniker."  In October 2015, "in preparation for the legalization of adult use cannabis in California, Jennings (along with Koskiniemi's wife)

6.

oversaw the formation of Loud Seeds, LLC, Loud Holdings, LLC (Loud Holdings), and Loud Farms, LLC," under the laws of California. "Although Almeida, Koskiniemi, and Jennings did not enter into operating agreements for the new entities at that time, the parties understood and agreed that these entities, their property, and their assets would fall under the larger umbrella of their oral partnership agreement." "Shortly thereafter, in December 2015, Loud Holdings filed numerous trademarks for the terms 'Loud' and 'Loud Farms' in various classes."

The FAC alleges: "Unbeknownst to Almeida and Koskiniemi, on October 17, 2016, Jennings formed Next Green Wave, LLC, which was to act as the primary vehicle for his business in California. Jennings then began working to obtain the funding needed to build the business. Jennings did so by representing that he was the owner of Loud Seeds and its genetics and that he had the rights to use Loud Seeds' valuable intellectual property in the new business."

The FAC notes:

> "In November 2016, California passed Proposition 64, which approved the legalization of adult use cannabis in California. This legalization served only to skyrocket the value of Loud Seeds' intellectual property because of the new and massive market available for it. At that point in time, consistent with the oral partnership agreement, Plaintiffs intended to seek to monetize Loud Seeds' intellectual property within the confines of California law. Plaintiffs understood that before they could legally cultivate and sell cannabis derived from their seeds, they would need to comply with California's regulatory framework, including by obtaining the proper state and local licenses and zoning approvals to cultivate and/or distribute cannabis products and ensuring that all taxes were paid, and intended to do so. Plaintiffs' intent to operate the partnership post-legalization, however, never came to fruition because Jennings converted the partnership's intellectual property for his own profit and cut Plaintiffs out of the partnership."

The FAC alleges: "As a result of those efforts, and Loud Seeds' valuable intellectual property, on September 29, 2017, Jennings—in his capacity as the sole member of

NGW—entered into a Letter of Intent with Crossgate Capital through which Crossgate Capital would acquire a 100% interest in NGW and its assets."

The FAC states: "For purposes of structuring that transaction, on October 11, 2017, Jennings formed NGW Holdings, LLC ("NGWH") under Nevada Law. Upon its formation, NGW, the California limited liability company formed solely by Jennings, became a wholly-owned subsidiary of NGWH." "To effectuate the acquisition, on January 28, 2018, Crossgate Capital, Crossgate Holdings, NGWH, and Jennings entered into a Securities Exchange Agreement. Through the Securities Exchange Agreement, Crossgate Holdings acquired 100% ownership in NGWH—and with it, all rights to its wholly-owned subsidiary, NGW." Among other provisions, the Securities Exchange Agreement provided Crossgate Holdings with " 'the sole, exclusive and irrevocable right and option to acquire one hundred percent' of Loud Seeds, including all of its IP, for up to $2,000,000 during a 36-month period. It also purported to give Crossgate Holdings the right to pay in either cash or stock, at its sole discretion. It did not, however, provide for Almeida or Koskiniemi to receive any consideration for that proposed transaction." According to the FAC, "[t]he acquisition of NGWH by Crossgate Holdings closed on April 4, 2018."

The FAC notes: "[Thereafter] Crossgate Capital and NGW Holdings ultimately raised more than $21,000,000 for their business through [an] investment memorandum that predicated the entire business model on Loud Seeds' brand and intellectual property. Crossgate Capital and NGW Holdings did this despite there being no agreement between Crossgate Capital, NGW Holdings, and Loud Seeds." "On or about May 2018, when Almeida and Koskiniemi became aware of the existence of NGW, Jennings represented to them that Loud Seeds would be rolled up into NGW and that they would receive their fair share of the business. Almeida and Koskiniemi did not consent to the execution of such a transaction, but agreed to consider the terms of any potential deal."

8.

The FAC alleges: "On May 11, 2018, Jennings emailed Koskiniemi terms for a potential acquisition of Loud Seeds by NGW, NGW Holdings, and/or Crossgate Holdings. The proposed terms were '$1 million in cash/shares combo' and '5% royalty on sales from the genetics provided by Loud Seeds to NGW.' Later that day, Jennings amended the royalty to cover only a 10-year period—one of many steps that he would take over the months to come to try to limit Plaintiffs' potential upside on a sale of Loud Seeds." "Jennings'[s] email also recognized that Loud Seeds had 'an unmatched catalog' of 'heirloom strains and rare hybrids' and 'current industry leading hybrids,' strains developed legally by Almeida. Jennings also admitted that through the potential acquisition, NGW would 'be able to gain immediate credibility, in the cannabis industry without as much as planting or growing a single seed.' "

The FAC states:

> "Shortly thereafter, Jennings traveled to Berkeley to meet Almeida. During that visit, Jennings requested that Almeida provide him with the partnership's physical seed inventory. The strains contained in that inventory were developed by Almeida, entirely legally pursuant to Proposition 215 and the MMPA, through cross-breeding and genetic mapping. In requesting that Almeida provide these seeds, Jennings specifically informed Almeida that the seeds would be used for purposes of having NGW purchase Loud Seeds and its intellectual property (which included those seeds). Unbeknownst to Almeida, Jennings'[s] statement to Almeida was intended to fraudulently induce Almeida into providing Jennings with the seeds so that Jennings could use them for his own benefit and to the detriment of Almeida and Koskiniemi. Almeida justifiably relied on Jennings'[s] representations and provided him with Loud Seeds' highly valuable seed inventory."

"On July 4, 2018, Crossgate Capital released a Non-Offering Prospectus. The prospectus included numerous statements that were contrary to fact, including [that] the company had an 'option to acquire LOUDSEEDS brand for up to US$2,000,000.' The prospectus also recognized that 'the Loud Seeds brand is the driving force behind the Company's premium cannabis products' and that 'the Company intends to use Loud Seeds … to produce top quality medical grade cannabis products.' " The FAC alleges the

9.

prospectus stated: " '[A]s of the date of this Prospectus, Loud Seeds seed bank comprises of over 300 different genetic varieties for cannabis and over 20,000 seeds originating from across the world. Through NGW, *the Company will continue to analyze and catalogue these genetic varieties and seeds* for new varieties in order to offer unique cannabinoid profiles and designed for a wide variety of therapeutic effects.' " "On August 22, 2018, as part of its pre-IPO process,[2] Crossgate Capital changed its name to NGW Holdings."

The FAC continues: "That same day, Koskiniemi's wife learned that Jennings claimed to have executed a letter of intent ("LOI") on May 5, 2018. In response, Koskiniemi requested that Jennings send him the signed LOI. Jennings did not do so." The FAC alleges: "Instead, Jennings sent an email to Koskiniemi titled 'loud seeds purchase agreement for loud seeds founders' that attached a proposed agreement through which NGW would purchase Loud Seeds. The email stated, 'have both of you' – referring to Koskiniemi and Almeida – 'sign and send it to me Fed Ex and scan and email it to me as well.' " "The purchase agreement increased the proposed purchase price from $1 million to $2 million USD in a combination of cash and shares. The agreement also recognized that there were 'three partners with equal interest' in Loud Seeds—Almeida, Koskiniemi, and Jennings. Appropriately, the agreement included signature lines for each of the partners." "Almeida and Koskiniemi did not agree to the proposal."

The FAC notes: "Despite there being no purchase agreement in place, on September 21, 2018, Jennings circulated an NGW investor deck to Koskiniemi. The investor deck, which was titled Q3 2018 Investor Presentation, repeatedly touted Loud Seeds' brand recognition and award-winning history, including its membership in the *High Times* Seed Bank Hall of Fame, as a basis for NGW's ability to compete in the California cannabis market." "Barely an hour later, Jennings sent Koskiniemi an email

---

[2] IPO refers to initial public offering.

titled 'need to close the deal' and requested, among other things, 'strain information for all genetics that are going to NGW as part of acquisition—genetic breakdown, strain descriptions, effects/benefits, cultivation information.' "

The FAC alleges: "Apparently undeterred by the ongoing negotiations, and despite there still being no binding agreement between the NGW Defendants, Almeida, and Koskiniemi, on October 1, 2018, NGW Holdings issued a final prospectus, which once again admitted [that] Loud Seeds 'is the driving force behind the Company's premium cannabis products,' acknowledged that NGW Holdings continued to use the Loud Seeds seed bank for its own benefit, and claimed to have the right to acquire the Loud Seeds brand."

The FAC states: "On October 8, 2018, Koskiniemi set an October 10th meeting among the three founders—Almeida, Jennings, and himself—to discuss how they 'want the documents drafted for the sale of Loud Seeds.' " "On or about October 8, 2018, Almeida, aware that NGW Holdings intended to go public in a matter of days, texted Jennings: 'Mike. Aren't we supposed to get shares of NGW BEFORE it goes public?' Jennings falsely responded: 'We don't get any shares until NGW buys Loud Seeds' and that the transaction would [not] happen until due diligence was completed. What Jennings omitted from his response was that he had already executed an agreement to receive 35,000,000 shares from NGW through the Securities Exchange Agreement." "To date, Almeida has never heard from Jennings again."

The FAC notes: "On October 10, 2018 NGW Holdings announced that it had been approved for trading on the Canadian Securities Exchange as of that date and that it would trade under the stock symbol 'NGW.' The announcement again highlighted Loud Seeds' six Cannabis Cup wins." The FAC adds: "Upon information and belief, Jennings sold 2,000,000 shares in NGW Holdings on the day that it was publicly listed for trading, and in doing so made hundreds of thousands of dollars based on the investor goodwill created by Jennings marketing NGW Holdings using Loud Seeds' intellectual property."

The FAC alleges: "On October 16, 2018, NGW Holdings announced 'that it has entered into a letter of intent whereby the company intends to acquire 100% of Loud Seeds, LLC along with the Loud Seeds brand and all of its related assets (the "Transaction"). As consideration for the Transaction, [NGW Holdings] intends to distribute $2,000,000 in common shares of the Company to the shareholders of Loud Seeds.' " "NGW Holdings' announcement acknowledged that 'Michael Jennings, CEO and Director of NGW [Holdings], is a principle [*sic*] in Loud Seeds' and thus that it was 'a related party transaction.' " NGW's announcement, that came via a news release, "highlighted that Loud Seeds 'brings an extensive catalogue of cannabis genetics into [NGW] accelerating its nursery and cultivation ability,' 'is a six-time High Times Cannabis Cup winner,' and 'has been inducted into the High Times Hall of Fame and listed in the Top 40 Seed Banks of all time.' " "Leigh Hughes—NGW Holdings' Executive Chairman—described the acquisition by stating, 'being able to bring one of the best seed banks in the world into our nursery continues to differentiate Next Green Wave from other cultivators. We are excited to join an award-winning genetics portfolio with world-class breeding skills as the construction of our first facility nears completion and begins cultivation.' " NGW Holdings' news release acknowledged that Loud Seeds was founded by James Koskiniemi and Mike Jennings, who were described as James Loud and Mike Seeds.

The FAC notes that Jennings gave an interview on October 23, 2018, in which he confirmed that Next Green Wave had acquired Loud Seeds in its entirety. Jennings further noted in the interview: " 'An acquisition like Loud Seeds means two very important things to Next Green Wave in the context of our visions and goals. In the short term what it does is provides us with immediate brand presence and recognition in our core market, which is California … secondly, from a long-term perspective, it really fulfills our vision of bringing in the core IP and SOPs on the genetics side which will facilitate us in our long-term vision of being a business-to-business supplier on the

nursery side, which is essentially the creation and production and sales being seeds and clones.' "

The FAC details that, on October 24, 2018, Koskiniemi emailed the NGW defendants as follows: " 'Hey guys, Just checking in, I saw the announcement of the Loud Seeds acquisition and have been getting calls from friends congratulating me.' " Koskiniemi added in the email: " '*I haven't seen any documentation regarding any of it.* Mike Jennings and David told me that Mike has to stay neutral because he is part of both entities and I was curious about the announcement.' "

The FAC continues: "Two days later, the NGW Defendants emailed Koskiniemi an unexecuted draft of a LOI concerning the purchase. The LOI provided for the sale of Loud Seeds and its assets, including its 'master genetic collection' for $2,000,000 of NGW shares. The LOI included blank spaces for execution by two directors of NGW Holdings, Koskiniemi, and Jennings." "The NGW Defendants' email also attached a document containing the purported history of Loud Seeds, which, among other things, recognized that Koskiniemi 'is the cofounder of Loud Seeds' and that Almeida was a part of Loud Seeds." "The email also attached a partial Loud Seeds Strain List that included 32 strains, such as Sour Diesel, 7/8 Sour, Loud, Headband, Loud Lemon Sour, and Purple Loud Scout. The email also included a 'Master Genetic Collection' that included, among other things, a list of approximately 115 'packed seeds' that included Loud Lemon Sour."

Thereafter, between October 30, 2018, and December 17, 2018, Koskiniemi and NGW Holdings continued to interact over the terms of NGW Holdings' anticipated acquisition of Loud Seeds. In the meantime, on November 8, 2018, NGW publicly filed an amendment to its prospectus "in which it falsely represented that the company had entered into a LOI with Loud Seeds on October 16, 2018. It made these public representations to its investors despite the fact that no such agreement existed." In response, Koskiniemi sent an email to the board of directors of NGW Holdings noting that he " 'only discovered NGW's intention to acquire Loud Seeds at the time NGW

13.

announced it to the market." Koskiniemi added: " 'As you know through NGW's own due diligence, Mr. Jennings has no independent authority to bind Loud Seeds. And as you further know, Mr. Jennings has a clear conflict of interest in negotiating this deal.' " "On November 21, 2018, the NGW Board informed Koskiniemi that the Share Exchange Agreement between NGW Holdings and Jennings provided it with the option to purchase Loud Seeds for a 36-month period for up to $2,000,000." NGW Holdings' board further "requested that the parties work towards a December 15th or January 15th closing date on the transaction."

"On November 25, 2018, Jennings gave an interview with the *Investing News Network* during which he touted the acquisition of Loud Seeds, despite there still being no such agreement." Jennings observed, inter alia, that " 'Loud Seeds has a track record of creating award-winning genetics and they have an extensive genetic library which will help us achieve our main goals and set us up as a premium nursery supplier.' " Jennings also noted that the Loud Seeds acquisition would " 'help us survive the onslaught of big corporate dollars that are coming into the space.' "

The FAC alleges: "On December 17th, counsel for Koskiniemi reached out to NGW Holdings' outside counsel concerning the negotiations.… On January [22, 2019], NGW responded simply that it 'had a number of projects and priorities that have taken all of our time and attention. Once we have worked through those items we will get back to you in a few weeks.' In truth, for reasons Plaintiffs would learn only much later, NGW Holdings did not respond to Plaintiffs for almost two months."

The FAC details: "Unbeknownst to Plaintiffs, NGW Holdings' 'undisclosed projects and priorities' was actually a scheme to obtain Loud Seeds' assets without Plaintiffs' knowledge. [¶] On or about December 19, 2018, Jennings and [NGW] Holdings executed an Assignment of Interest (the 'Assignment'). Through the Assignment, Jennings (the 'Assignor' thereunder) assigned to [NGW] Holdings (the 'Assignee' thereunder) the rights to the seed inventory created by Plaintiffs."

14.

"Specifically, Section 1 of the Assignment provided that '[f]or value received, which is acknowledged, the Assignor hereby assigns all interests and benefits to the seed inventory in Appendix A.' " "Section 2 of the Assignment provided that '[t]he Assignor warrants the Assignee that the seed inventory is owned free and clear of all encumbrances.' " "Appendix A included a list of 112 cultivars of seeds, including 32 cultivars that the Assignment acknowledged were 'created by' 'Loud Seeds.' These cultivars included, among many others, 'Original Loud,' '7/8th Sour,' and 'Headband.' " "Upon information and belief, as part of the Assignment, Jennings transferred to NGW Holdings the physical samples of Loud Seeds' seed bank, which he had fraudulently induced Almeida to provide him." "At that time, Plaintiffs were unaware of the Assignment; indeed, at that time Plaintiffs were under the belief that the parties were still negotiating a deal through which NGW Holdings would purchase Loud Seeds."

The FAC alleges: "On January 8, 2019, NGW Holdings issued a news release to 'announce that the Company's Chief Executive Officer and director, Michael Jennings, has assigned 100% of his interests and benefits to a cannabis genetics inventory including 112 cultivars (the 'Genetics Inventory') to the Company's wholly owned subsidiary." "The news release acknowledged that Jennings 'was paid nominal consideration' for the Assignment. In reality, Jennings received consideration through the value that it provided to NGW Holdings' business—of which he was the largest shareholder— because the business needed the cultivars to be able to compete in the California cannabis market." The news release noted: " 'Next Green Wave expects the Acquisition will help the Company adapt to growing demand trends and expedite its development of hybrids that meet premium standards.' " "Just days later, on January 14, 2019, NGW Holdings announced that its board had appointed Leigh Hughes as the new Chief Executive Officer and that Jennings would 'transition into the role of Chief Operations Officer and Head of Research and Innovation.' "

15.

The FAC notes: "The next day, January 15, 2019, NGW Holdings announced steps to capitalize on its newly—and wrongfully—acquired cannabis cultivars. Specifically, NGW Holdings announced that [it] had 'entered into a strategic licensing agreement to utilize Intrexon's Botticelli next generation plant propagation platform to enable rapid production of Next Green Wave's proprietary cannabis cultivars for the California market.' " "In a January 15, 2019 interview with Proactive Investors, Jennings stated, 'if you look at the foundation of the cannabis industry as a whole, everything stems from the seed, which at the end of the day end up being the genetics that you cultivate and turn [it] into not just flowers, oils, but any consumer product.' " "Shortly thereafter, on February 14, 2019, NGW Holdings announced that it entered into a memorandum of understanding with Organic Medical Growth OMG3 Inc. ("OMG3"), which is a Canadian-based company operating a wholly-owned Colombian cannabis subsidiary. On March 15, 2019, NGW Holdings announced that it had executed a definitive agreement with OMG3."

The FAC states: "Upon information and belief, NGW Holdings received millions of shares of OMG3—which propped up the value of the NGW business—and, in return, NGW Holdings provided OMG3 with certain seeds and strains that Plaintiffs had created and the standard operating procedures associated with the creation of those seeds. This transition allowed OMG3 to capitalize on Plaintiffs' intellectual property and for the NGW Defendants to directly profit therefrom."

The FAC notes: "On March 18, 2019, nearly two months after their last communication with Plaintiffs, the NGW Board informed Koskiniemi that 'the Company has decided not to proceed with the letter of intent signed on October 15, 2018, [regarding] the acquisition of 100% percent of Loud Seeds.' " The FAC states: "Jennings'[s] illicit assignment—for which Plaintiffs received no compensation—mooted NGW Holdings' previously stated rationale for the LOI." The FAC alleges that NGW Holdings made disingenuous excuses to Koskiniemi in stating that the decision was made

16.

" 'primarily due to concerns with ownership, trademarks, inventory, and requested changes to the terms of the LOI.' "

"On March 20, 2019, NGW Holdings issued a press release that announced 'that it has decided not to proceed with the acquisition of Loud Seeds, LLC as announced in a press release dated October 16, 2018. On January 8, 2019, the Company acquired an extensive catalogue of award-winning cannabis genetics and connoisseur seeds, this inventory will ensure that its end-product is that of a premium quality standard.' " "In NGW Holdings' Q1 2019 corporate presentation, it touted the wrongfully-acquired cultivars from Loud Seeds," stating NGW " 'will create hybrid strains and be a major supplier of clones, seeds and seedlings to retail and wholesale clients.' " "Indeed, it noted that NGW's nursery only held approximately 120 cultivars—of which 112 came from Jennings'[s] illicit Assignment." According to the FAC, "[t]he presentation also openly admitted that 'through the Loud Seeds brand, NGW has established relationships with several of the major dispensaries and media in CA.' "

The FAC observes: "By 2019, it was reported that California had become the world's largest legal cannabis market. This year, California's cannabis market is estimated to be approximately $5 billion with it expected to grow to more than $7 billion by 2025." "Since Jennings and the NGW Defendants' improper and tortious acquisition of Plaintiffs' intellectual property, and the NGW Defendants' decision to abandon a potential acquisition of Loud Seeds, the NGW Defendants have used Plaintiffs' brand and intellectual property to build their business in the thriving California adult use cannabis market." NGW Holdings publicly-filed financial statements reveal that "for the nine-month period ended September 30, 2021, NGW had revenues in excess of $12.7 million—up from $7.9 million over the same period in 2020 and $141,000 in 2019. This increase of more than 8,900% in a two-year period would not have been possible but for the NGW Defendants['] access to, and use of, Plaintiffs' intellectual property." NGW

has repeatedly touted its "exclusive seed library consisting of 120 cannabis strains and hybrids including award-winning cultivars."

The FAC alleges: "The NGW Defendants' profit from Plaintiffs' intellectual property has come directly at the expense of Plaintiffs who have been shut out from the opportunity to build a thriving California cannabis business in its booming marketplace. And no one has profited [more from] Plaintiffs' intellectual property than Jennings who has parlayed it into at least 35,000,000 shares of NGW Holdings—a 16% ownership stake—that upon information and belief earned him millions of dollars." The FAC notes: "Jennings was, at all times relevant to this action, under a duty to disclose this information [that is, NGW's Holdings' appropriation and use of Loud Seeds' intellectual property] to Plaintiffs due to their fiduciary relationship. Jennings, however, not only failed to disclose such information, but … actively took steps to conceal the true facts from Plaintiffs."

More specifically, the FAC states that Jennings and the NGW defendants actively concealed the following facts: (1) Jennings intended to use the seeds obtained from Almeida for his own benefit and not for the furtherance of the partnership; (2) Jennings unilaterally executed the Assignment, in contravention of his fiduciary duties to Plaintiffs; and (3) the NGW defendants were using the Loud Seeds' brand and intellectual property in their day-to-day business operations, including with third parties. The FAC adds that Jennings and the NGW defendants "took affirmative actions to keep this information from Plaintiffs," including by: (1) dragging out negotiations with plaintiffs to keep them in the dark, when the decision to execute the Assignment had already been made; (2) giving bogus reasons for not proceeding with the acquisition of Loud Seeds; and (3) obfuscating the true ownership of the intellectual property subject to the Assignment and falsely implying to the public and investors that Jennings was its rightful owner.

The FAC details:  "Plaintiffs did not uncover the true nature of the NGW Defendants' deceit until they were informed of the Assignment by a party with direct knowledge of the transaction[,] during the summer of 2019.  Following Plaintiffs' discovery of the NGW Defendants' wrongful and tortious conduct, Almeida sought to engage in discussions with the NGW Defendants for the purposes of receiving fair consideration for his and Koskiniemi's ownership of the Loud Seeds brand and intellectual property.  To that end, Almeida set up a meeting with the NGW Holdings' Board of Directors on or about December 2019, during which he informed them of the wrongful conduct alleged herein and sought a fair compensation.  Upon information and belief, the NGW Defendants' engagement with Almeida was intended to forestall Plaintiffs from filing a lawsuit."

The FAC alleges:  "In spring 2021, the NGW Defendants laid bare their intentions in this regard.  After receiving a document preservation notice from Plaintiffs' litigation counsel, a NGW board member again engaged Almeida, offering to compensate Plaintiffs for their share of Loud Seeds' intellectual property on the condition that Plaintiffs did not involve lawyers."  The FAC notes:  "Once it became clear that the NGW Defendants had no intent of fairly compensating Almeida and Koskiniemi for Loud Seeds' intellectual property including its brand and seed bank, and instead only wanted to lull Plaintiffs into not asserting their rights, Plaintiffs, on December 17, 2021, filed their verified complaint in this action to redress Jennings and the NGW Defendants' wrongdoing."

Finally, the FAC addresses the events concerning NGW Holdings that occurred around the time this lawsuit was initiated.  The FAC states:  "On December 20, 2021— one business day after Plaintiffs commenced this action—NGW Holdings and Planet 13 announced that they had entered into a definitive … agreement pursuant to which Planet 13 would acquire all of the issued and outstanding common shares in NGW Holdings at an implied deal price of CAD $0.465 per share.  At the time of the announcement, the

19.

acquisition was valued at about CAD $91,000,000, or approximately USD $70,980,000."
"In announcing the acquisition, the parties jointly noted in the press release that 'NGW's operations will serve as the backbone of Planet 13's continued focus on the California market' and that the transaction would allow 'Planet 13 to benefit of NGW's highly respected cultivation techniques and pheno-hunted cultivars'—*i.e.*, Loud Seeds' intellectual property, which NGW Holdings had tortiously obtained."

The FAC notes: "In connection with the acquisition, NGW Holdings publicly disclosed various Voting and Support Agreements for major shareholders, including Jennings. Jennings'[s] Voting and Support Agreement stated that he owned 26,000,000 common shares and had 1,050,000 options. At the implied deal price, those holdings would be valued at approximately CAD $12,578,250, or USD $9,811,035." "On January 25, 2022, NGW Holdings issued a Management Information Circular. That document … revealed that [the company] held a very real concern about liabilities arising from the [instant] litigation. Specifically, it disclosed that on December 13, 2021—just days before Plaintiffs commenced this action—Jennings entered into an indemnity agreement with NGW Holdings and Planet 13 whereby he would 'indemnify, defend, and hold harmless NGW … and Planet 13 … from liability, damages, costs, and attorneys' fees incurred in connection with this litigation.' "

The FAC concludes: "On March 2, 2022, Planet 13 announced that it had closed the transaction and completed its acquisition of NGW Holdings. In its press release, Planet 13 touted that the transaction would 'serve as the backbone of Planet 13's operations in the California market.' " "Since that time, upon information and belief, Planet 13 has operated through NGW Holdings in the California market and, in doing so, has exploited and misappropriated Plaintiffs' intellectual property for its own commercial gain."

**TRIAL COURT'S RULING ON DEFENDANTS' DEMURRERS TO THE FAC**

The trial court sustained defendants' demurrers to plaintiffs' FAC. In its ruling, the trial court first summarized the FAC's pertinent allegations: "The object of the partnership was 'to build the Loud Seeds brand around the proprietary cannabis seed strains and breeds legally developed by Almeida pursuant to Proposition 215 and the MMPA, and to monetize the intellectual property—the Loud Seeds brand and genetically-unique and proprietary seed strains Almeida developed—after California legalized adult-use cannabis. The partnership never engaged in any conduct intended to generate a profit from the cultivation or sale of cannabis plants or seeds prior to the legalization of adult-use cannabis, nor did it ever contemplate doing so. Instead, the partnership at all times intended to operate in full compliance with California's applicable laws and regulations.' " The trial court iterated that the FAC indicates "that the partnership was formed with the intention to sell cannabis seeds only 'after California legalized adult-use recreational cannabis, and only after obtaining the proper licenses from the State.' " The trial court also noted that the FAC references "the Medical Marijuana Program Act ('MMPA'), enacted in 2004, which immunized qualified patients and caregivers cultivating and distributing marijuana for the use of qualified patients, and specifically alleges that defendant Almeida obtained a doctor's recommendation to legally grow cannabis under the MMPA."

The trial court next summarized the parties' positions as to the demurrers. As to defendants, the court noted: "[A]s the NGW Defendants point out, the FAC still reflects that the partnership was a for-profit entity, and nothing in the MMPA allowed the formation of a for-profit partnership through which qualified patients were allowed to use their marijuana privileges to gain an economic advantage over other Californians in preparation for when adult use became legal. As the court noted in its prior ruling, at the time the partnership was created, the cultivation of cannabis for profit was *illegal* in California. (Health & Saf. Code, § 11362.765, subd. (a); see also, *People v. London*

21.

(2014) 228 Cal.App.4th 544, 553 ['The MMPA does not allow qualified patients, valid identification cardholders, or their primary caregivers to earn a profit from the cultivation or distribution of medical marijuana, whether through a cooperative, collective, or otherwise.' "].)

As to the plaintiffs, the court observed: "The gravamen of plaintiffs' opposition appears to be that, because the partnership did not make an actual profit before legalization in California, the partnership was not illegal under the MMPA. This is unpersuasive. As the NGW Defendants note in reply, regardless of when the profits were to be realized, the partnership had an illegal purpose when it was formed in 2008. (*People v. Jackson* (2012) 210 Cal.App.4th 525, 538 ['there is little doubt the Legislature did *not* intend to authorize profit-making enterprises' when it established the MMPA].) Plaintiffs' argument is also contrary to allegations included in the FAC. For example, the FAC states that defendant Jennings paid money in exchange for being included in the partnership. [Citation.] Further, as defendant Jennings notes, the FAC never alleges that the partnership or any of its associated limited liability companies applied for a license to cultivate, distribute, or sell cannabis, or take any concrete steps to engage in legal commerce in cannabis once the plaintiffs and the Loud Seeds entities had the opportunity to do so."

The court concluded: "[T]he court finds that each cause of action is enmeshed in the parties' illegal cannabis business and cannot be extricated. The object of the partnership agreement was illegal at the time it was entered into and remains so under current law. The intrinsic illegality of the partnership agreement to share in the profits of the illegal cultivation of cannabis does not support the conclusion that the agreement is enforceable. (*Asdourian v. Araj* [(1985)] 38 Cal.3d [276,] 292-293.)"

The court "sustain[ed] both the NGW Defendants' and defendant Jennings'[s] demurrers to the FAC without leave to amend." The court also found: "The arguments advanced in the opposition do not indicate that the allegations of the FAC can be

amended to allow the court to enforce a lawful partnership agreement that forms the basis of all causes of action."

## DISCUSSION

### I.     Based on the Allegations in the FAC, the Oral Partnership Agreement Entered into by Almeida, Koskiniemi, and Jennings Is Enforceable

The trial court sustained defendants' demurrers on grounds that (1) "the partnership [at issue in this matter] had an illegal purpose when it was formed" and (2) "each cause of action is enmeshed in the parties' illegal cannabis business and cannot be extricated."  The court concluded:  "The object of the partnership agreement was illegal at the time it was entered into and remains so under current law.  The intrinsic illegality of the partnership agreement to share in the profits of the illegal cultivation of cannabis does not support the conclusion that the agreement is enforceable."

Plaintiffs challenge the trial court's conclusions as erroneous, while defendants contend the trial court ruled correctly.  The parties' arguments turn on the legality, and in turn, the enforceability of the oral partnership agreement between Koskiniemi, Almeida, and Jennings.  We conclude plaintiffs have the better argument.

#### A.     *Standard of Review*

An order sustaining a demurrer is reviewed de novo to determine whether the complaint states a cause of action.  (*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1501.)  On appeal, we " 'treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.' " (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)  "[I]t is error" for a "trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory." (*Genesis Environmental Services v. San Joaquin Valley Air Pollution Control Dist*. (2003) 113 Cal.App.4th 597, 603 (*Genesis*).)

" 'On a demurrer[,] a court's function is limited to testing the legal sufficiency of the complaint,' " and thus " ' "[a] demurrer is simply not the appropriate procedure for

23.

determining the truth of disputed facts." ' " (*Panterra GP, Inc. v. Superior Court* (2022) 74 Cal.App.5th 697, 710.) "Questions of fact generally require the consideration and weighing of evidence, which makes them unsuitable for resolution" at the pleading stage. (*M.F. v. Pacific Pearl Hotel Management LLC* (2017) 16 Cal.App.5th 693, 703.) Nor is a demurrer the proper mechanism for determining "what inferences should be drawn where competing inferences are possible." (*CrossTalk Productions, Inc. v. Jacobson* (1998) 65 Cal.App.4th 631, 635.)

### B.    The Parties' Positions

**Plaintiffs' Position**

On appeal, Plaintiffs contend that in light of the fact that "Almeida was a qualified patient," the court "committed serious and reversible error in concluding that the oral partnership agreement that he had entered with Koskiniemi and Jennings contravened the MMPA's ban on profit-making and was therefore illegal." Plaintiffs contend "the court fundamentally misconstrued the agreement and misinterpreted the MMPA, including the meaning of profit."

Plaintiffs further argue that the trial court's ruling should be vacated because "the trial court improperly decided disputed facts" and therefore "exceeded its pleading-stage function," which is merely to test the legal sufficiency of the claims asserted in the operative complaint. (Some capitalization omitted.) More specifically, plaintiffs argue: "Here, whether the partners agreed to conduct for-profit activity, whether Jennings'[s] investment constituted for-profit activity, and whether the partners made future commercial plans that fell within the ambit of the MMPA's profit-making prohibition are all materially disputed factual issues that are not ripe for resolution at the pleading state of a demurrer. Therefore, as a procedural matter, the trial court erred in sustaining the Defendants' demurrers and concluding that the agreement was illegal in the face of factual disputes and without the benefit of fact discovery on the agreement's scope and the partners' intentions and conduct."

24.

Plaintiffs also argue that "equity demands enforcing the partnership agreement." (Some capitalization omitted.) Citing *Aghaian v. Minassian* (2021) 64 Cal.App.5th 603, they note that, "[u]nder California law, courts will not apply the general rule against the enforcement of illegal contracts when: '(1) the public cannot be protected because the transaction has been completed; (2) no serious moral turpitude is involved; (3) the defendant is the one guilty of the greatest moral fault; and (4) to apply the rule will permit the defendant to be unjustly enriched at the expense of the plaintiff.' " Plaintiffs posit: "Here, even if the object of the partnership entered into by Jennings, Almeida, and Koskiniemi was illegal (which it was not), Almeida and Koskiniemi should be permitted to pursue their claims against Defendants because the factors considered by the California Supreme Court when determining [whether] to enforce an illegal contract plainly apply."

Finally, citing multiple authorities, Plaintiffs point out that "in the context of purportedly illegal cannabis contracts, numerous courts have enforced agreements where, as here, 'the potential remedy … would not mandate illegal activity.' " Plaintiffs conclude: "Overall, enforcing the partnership agreement and awarding Almeida and Koskiniemi money damages for their rightful share of the Loud Seeds intellectual property that Defendants have exploited for their own benefit would not mandate or require illegal conduct by any party or the Court in any manner whatsoever."

**NGW Defendants' Position**

NGW defendants, in their brief, respond: "The Trial Court correctly found that the underlying oral partnership agreement was illegal under the MMPA because its object was to make a profit." NGW defendants note: "All possession, cultivation, and use of marijuana was illegal, except those narrow exceptions outlined in the CUA [Compassionate Use Act] and MMPA." NGW defendants add: "[T]he law precludes qualified persons from abusing their marijuana privileges for impermissible uses, such as for-profit purposes."

25.

NGW defendants further contend:  "Equity does not demand the enforcement of the illegal oral partnership agreement."  (Some capitalization omitted.)  NGW defendants argue:  "Illegal contracts can *only* be enforced if their objects are not illegal."  NGW defendants posit:  "Appellants formed a for-profit entity to possess and cultivate marijuana in order to secure a future financial gain.  That object directly conflicts with the MMPA.  That direct conflict results in the contract being malum in se and renders any claims based upon it unenforceable."

**Jennings's Position**

Jennings, for his part, contends in his brief the trial court correctly rejected plaintiffs' arguments that "the partnership was not intended to sell cannabis prior to legalization, to make a profit prior to legalization, and that the partnership did not make a profit prior to legalization."  Jennings argues:  "[T]he partnership had an illegal purpose at the moment it was created, and whether it subsequently made profits is not relevant to whether the oral partnership agreement, when made, was illegal."  Jennings also posits that "an equitable exception to the general rule against enforcement of illegal contracts" is not applicable here because "Appellants admitted to conduct that violated criminal laws in their verified pleadings."

### C.      *Legal Framework for Analyzing Legality/Enforceability of a Contract*

One of the "essential" elements of a contract is that it have a "lawful object."  (Civ. Code, § 1550, subd. (3).)  "The object of a contract is the thing which it is agreed, on the part of the party receiving the consideration, to do or not to do."  (Civ. Code, § 1595.)  "The object of a contract must be lawful when the contract is made, and possible and ascertainable by the time the contract is to be performed."  (Civ. Code, § 1596.)  Contracts without a lawful object are void.  (Civ. Code, § 1598.)  "Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest."  (Civ. Code, §  1599; see Civ. Code, § 1441 ["A condition in a contract, the fulfillment of

26.

which is … unlawful … is void."]; see also *Armendariz v. Foundation Health Psychcare Services, Inc*. (2000) 24 Cal.4th 83, 124 ["If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced."].)

Civil Code section 1667 provides: "That is not lawful which is: [¶] 1. Contrary to an express provision of law; [¶] 2. Contrary to the policy of express law, though not expressly prohibited; or, [¶] 3. Otherwise contrary to good morals." Civil Code section 1668 elaborates that a contract that has as its object a violation of law is "against the policy of the law." Courts have held that a lawful contract "must not be in conflict either with express statutes or public policy." (*Vierra v. Workers Comp. Appeals Bd*. (2007) 154 Cal.App.4th 1142, 1148.) Consequently, "[a] contract that conflicts with an express provision of the law is illegal and the rights thereto cannot be judicially enforced." (*Ibid*.)

Very simply, " 'a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out.' " (*Lee On v. Long* (1951) 37 Cal.2d 499, 502; accord *Wong v. Tenneco, Inc*. (1985) 39 Cal.3d 126, 135; *Lewis & Queen v. N.M. Ball Sons* (1957) 48 Cal.2d 141, 150 ["courts generally will not enforce an illegal bargain or lend their assistance to a party who seeks compensation for an illegal act"].) Importantly, since the doctrine of illegality of contracts is grounded in public policy, the focus is on whether *the object of the contract is illegal, not on the extent of either party's participation in the illegality*. (*McIntosh v. Mills* (2004) 121 Cal.App.4th 333, 346 ["the doctrine of illegality considers whether the *object* of the contract is illegal[;] [i]t does not turn on whether the illegality applies to the *party* seeking to enforce the agreement"].) In sum, " '[t]he effect to be given to an illegal element of a contract … depend[s] on how the court can best serve the interest of the public and, when not inimical to the public interest, do justice to the parties.' " (*Ibid*.)

"Ordinarily ' "all applicable laws in existence when an agreement is made, which laws the parties are presumed to know and to have had in mind, necessarily enter into the

contract and form a part of it, without any stipulation to that effect, as if they were expressly referred to and incorporated." ' " (*City of Torrance v. Workers' Comp. Appeals Bd*. (1982) 32 Cal.3d 371, 378.) As for laws enacted subsequent to the formation of an agreement, the parties, *when entering into an agreement*, may agree to incorporate *subsequent* changes in the law into the agreement. (*Swenson v. File* (1970) 3 Cal.3d 389, 393 ["the parties could have … agreed to incorporate *subsequent changes* in the law" into their agreement when it was made], italics added.)

Although "the general rule [is] that the courts will deny relief to either party who has entered into an illegal contract or bargain which is against public policy," *Tri-Q, Inc. v. Sta-Hi Corp*. (1965) 63 Cal.2d 199, 216, equitable considerations play a role in determining whether an illegal contract is nonetheless enforceable. In *Kashani v. Tsann Kuen China Enterprise Co*. (2004) 118 Cal.App.4th 531, 543 (*Kashani*), the court affirmed the trial court's grant of summary judgment to the defendants who argued that the parties' contract was unenforceable as it was illegal and against public policy because it involved trade and commerce with Iran. In doing so, however, the *Kashani* court did not hold that any agreement that involves an illegal contract is necessarily void. On the contrary, *Kashani* recognized that "[c]ourts in California have, depending on the facts, carved out exceptions to the statutory and judicial language that illegal contracts are void and unenforceable." (*Id*. at p. 541 [collecting cases].)

*Kashani* pointed out that "one of the principles courts apply in deciding whether an illegal contract can be enforced is whether a party calls on a court to order another party to carry out an illegal object." (*Mann v. Gullickson* (N.D. Cal. Nov. 2, 2016, 15-cv-03630-MEJ) 2016 U.S.Dist. Lexis 152125 *20 (*Mann*), citing *Kashani*, *supra*, at p. 540.) " 'Sometimes the forfeiture resulting from unenforceability is disproportionately harsh considering the nature of the illegality. "In each such case, how the aims of policy can best be achieved depends on *the kinds of illegality and the particular facts involved*." ' " (*Mann*, *supra*, at *21, quoting *Kashani*, *supra*, at p. 557 ["Even if a determination of

28.

enforceability of patently illegal contracts can be based on the particular facts, plaintiffs have not established any basis for departing from the practice of courts generally not to enforce a contract in violation of law."].)

Similarly, in *Asdourian v. Araj*, the California Supreme Court instructed that " '[i]n compelling cases, illegal contracts will be enforced in order to 'avoid unjust enrichment to a defendant and a disproportionately harsh penalty upon the plaintiff.' " (*Asdourian v. Araj*, *supra*, 38 Cal.3d at p. 292 (*Asdourian*).) The *Asdourian* court noted that " ' "[i]n each case, the extent of enforceability and the kind of remedy granted depend upon a variety of factors, including the policy of the transgressed law, the kind of illegality and the particular facts." ' " (*Ibid.*) While *Asdourian* recognized that "[n]ormally, courts will not ' "lend their aid to the enforcement of an illegal agreement," ' " it explained "[t]his rule is based on the rationale that 'the public importance of discouraging such prohibited transactions outweighs equitable considerations of possible injustice between the parties.' " (*Id.* at p. 291.)

In *Bassidji v. Goe* (9th Cir. 2005) 413 F.3d 928 (*Bassidji*), the Ninth Circuit considered a breach of contract action in which enforcement of the contract would have furthered trade with an Iranian company in contravention of a federal Executive Order. (*Id.* at pp. 938-939.) *Bassidji* analyzed federal and California precedents, including *Kashani*, and noted that "[b]oth federal law and California law begin from the core proposition that … courts will not order a party to a contract to perform an act that is in direct violation of a positive law directive, even if that party has agreed, for consideration, to perform that act." (*Bassidji*, *supra*, at p. 936.) However, *Bassidji* investigated "[n]uanced approaches to the illegal contract defense, taking into account such considerations as the avoidance of windfalls or forfeitures, deterrence of illegal conduct, and relative moral culpability." (*Id.* at pp. 937-938.) The *Bassidji* court noted such considerations were valid "[so] long as the relief ordered does not mandate illegal conduct." (*Id.* at pp. 938-939 [neither federal nor state courts will enforce a contract by

29.

"order[ing] a legal violation"].)  *Bassidji* ultimately concluded that enforcement of the contract at issue there would mandate illegal conduct because requiring the defendant to pay the plaintiff "would provide funds to the Iranian economy, paying for goods in Iran," in direct contravention of a federal Executive Order.  (*Id*. at p. 939.)  Nevertheless, *Bassidji* clarified that in assessing the enforceability of " 'illegal contracts,' " courts should consider whether a remedy exists "that would not require a court to order a legal violation."  (*Ibid*.)

*Mann* discussed *Kashani*, *Asdourian*, and *Bassidji* in considering the question of enforcement of an illegal contract under California law.  With respect to these authorities, *Mann* observed:  "The foregoing case law demonstrates that even where contracts concern illegal objects, where it is possible for a court to enforce a contract in a way that does not require illegal conduct, the court is not barred from according such relief.  However if, as in *Bassidji*, the enforcement of a contract would require the court to order illegal conduct, such contracts are unenforceable."  (*Mann*, *supra*, 2016 U.S.Dist. Lexis 152125 at \*\*23-24; see *Bassidji*, *supra*, 413 F.3d at p. 938 ["California courts will not 'fashion an equitable remedy' where doing so involves 'enforcing [by court order] the precise conduct made unlawful … in contravention of the legislative purpose' "].)

### D.    *Relevant Cannabis-Related Statutory Law*

Prior to the legalization of adult-use cannabis in California in 2016, adult-use of the substance was illegal under state law and it could be used legally only for medicinal purposes.  The use of marijuana for medicinal purposes was governed by the Compassionate Use Act of 1996 (CUA) and the Medical Marijuana Program Act (MMPA).  The CUA, Health and Safety Code section 11362.5 (added by initiative measure Prop. 215, as approved by voters, Gen. Elec. (Nov. 5, 1996)), gave a person who used marijuana for medical purposes on a physician's recommendation, a defense to certain state criminal charges involving the substance, including unauthorized possession (see Health & Saf. Code, §§ 11357 (criminalizing unauthorized possession), 11362.5,

30.

subd. (d) (exempting approved patients and primary caregivers).) " '[T]he Compassionate Use Act is a narrowly drafted statute designed to allow a qualified patient and his or her primary caregiver to possess and cultivate marijuana for the patient's personal use despite the penal laws that outlaw these two acts for all others.' " (*Qualified Patients Assn. v. City of Anaheim* (2010) 187 Cal.App.4th 734, 743.) "[A]part from possession and cultivation, 'the Compassionate Use Act did not alter the other statutory prohibitions related to marijuana, including those that bar the transportation, possession for sale, and sale of marijuana.' " (*Ibid.*)

In 2004, the state legislature expanded the criminal immunities in the CUA through the MMPA (Health & Saf. Code, § 11362.7 et seq.). " 'Among other things, these statutes exempt[ed] the "collective[] or cooperative[] … cultiva[tion]" of medical marijuana by qualified patients and their designated caregivers from prosecution or abatement under specified state criminal and nuisance laws that would otherwise [have] prohibit[ed] those activities.' " (*The Kind & Compassionate v. City of Long Beach* (2016) 2 Cal.App.5th 116, 120; *People v. London* (2014) 228 Cal.App.4th 544, 552 ["The MMPA 'expressly expands the scope of the [CUA] beyond the qualified defense to cultivation and possession of marijuana' to possession of marijuana for sale (§ 11359) among other offenses."]; *Qualified Patients Assn. v. City of Anaheim*, *supra*, 187 Cal.App.4th at p. 749 [the MMPA implements the CUA in that "it identifies groups that may lawfully distribute medical marijuana to patients under the CUA"]; *People v. Hochanadel* (2009) 176 Cal.App.4th 997, 1008 [" '[The MMPA's] specific itemization of the marijuana sales law indicates it contemplates the formation and operation of medicinal marijuana cooperatives that would receive reimbursement for marijuana and the services provided in conjunction with the provision of that marijuana."].) However, the MMPA did not authorize the cultivation, distribution, or sale of marijuana for profit. (Health & Saf. Code, § 11362.765, subds. (a), (b) [immunizing qualified patients and designated caregivers from prosecution for enumerated offenses and specifying that "this

section" does not "authorize any individual or group to cultivate or distribute cannabis for profit"].)

In November 2016, voters directly approved the Adult Use of Marijuana Act (Proposition 64), fully legalizing the recreational use of marijuana and for-profit marijuana operations in California. (Bus. & Prof. Code, § 26000 et seq. (Medicinal and Adult-Use Cannabis Regulation and Safety Act).) In 2018, section 1550.5, subdivision (b)(1) was added to the Civil Code (amended in 2019); this section expressly provides that contracts related to cannabis are "[a] lawful object of a contract." More specifically, Civil Code section 1550.5, subdivision (b) provides that "Notwithstanding any law, including, but not limited to Sections 1550, 1667, and 1668 and federal law, commercial activity relating to medicinal cannabis or adult-use cannabis conducted in compliance with California law and any appliable local standards, requirements, and regulations shall be deemed to be … [a] lawful object of a contract"; "[n]ot contrary to, an express provision of law, any policy of express law, or good morals"; and "[n]ot against public policy." Proposition 64 added, *inter alia*, Health and Safety Code section 11362.1, which permits adults to possess, transport, and cultivate marijuana. (See *Shulman v. Kaplan* (9th Cir. 2023) 58 F.4th 404, 408 ["California recognizes cannabis-related property interests."].)

As for federal law, the Controlled Substances Act, 21 U.S.C. section 801, et seq., (the CSA), prohibits the knowing manufacturing, distribution, possession, or cultivation of a controlled substance. (21 U.S.C. §§ 841, subd. (a), 844, subd. (a); see *Gonzales v. Raich* (2005) 545 U.S. 1, 26-29 [Congress's plenary power under the Commerce Clause includes the power to prohibit local cultivation of marijuana in compliance with the CSA, and "[t]he Supremacy Clause unambiguously provides that if there is any conflict between federal and state law, federal law shall prevail"].) However, "the United States Department of Justice 'has declined to enforce 21 U.S.C. [section] 841 when a person or company buys or sells marijuana in accordance with state law.' " (*Indian Hills Holdings,*

*LLC v. Frye* (S.D. Cal. Dec. 17, 2021, 3:20-cv-00461-BEN-AHG) 2021 U.S.Dist. Lexis 241821 *20 (*Indian Hills*).) "In fact, in 2014, Congress ' "reinforced this arrangement by defunding the" Department of Justice's "prosecution of the exchange of medical marijuana where it is legal under state law." ' " (*Id.* at **20-21.) "[T]hese Congressional mandates suggest that enforcing [California commercial contracts involving marijuana] would not violate public policy even if [there is] a prima facie violation of federal law." (*Id.* at *21.)

*Indian Hills* concluded: " '[R]ecent case law involving cannabis-related business contracts does not espouse an absolute bar to the enforcement of such contracts.' " (*Indian Hills*, *supra*, 2021 U.S.Dist. Lexis 241821 at *25 [collecting cases]; accord *Kowall Ventures, LLC v. Mehdizadeh* (C.D. Cal. 2021) WL 2546747, *1; see *Green Earth Wellness Center, LLC v. Atain Specialty Insurance Co.* (D. Colo. 2016) 163 F.Supp.3d 821, 832, 835 [noting that "the nominal federal prohibition against possession of marijuana conceals a … nuanced (and perhaps even erratic) expression of federal Policy"]; see also *Mann*, *supra*, 2016 U.S.Dist. Lexis 152125 at *34 [noting, in enforcing marijuana-related business contract, that "[g]iven the federal government's wavering policy on medical marijuana in states that regulate this substance, and California's expressed policy interest in allowing qualified patients to obtain medical marijuana, the purported illegality here is not one the Court finds to mandate non-enforcement of the parties' contract"].) Here, respondents have simply not addressed the role of federal law. Accordingly, we will not further address federal law.[3]

### E. Analysis

The FAC alleges that Almeida, a qualified patient under the CUA and MMPA, had legally developed desirable marijuana seeds and cultivars around 2008 (Almeida never sold any seeds or cultivars he had developed). The FAC further alleges that

---

[3] NGW defendants' brief does not mention federal law at all and Jennings's brief contains only a passing reference to federal law, in a single sentence.

sometime thereafter, Almeida, Koskiniemi, and Jennings entered into an oral agreement to form a partnership to generate publicity and develop a brand for the seeds and cultivars that Almeida had developed, including by giving interviews about the seeds and cultivars and entering them into competitions. The three men further agreed that once California legalized recreational, adult-use marijuana and commercial marijuana sales—something that could happen at any time—they would legally market the seeds and cultivars for a profit. According to the FAC, the partnership was not intended to, and did not, cultivate *for sale* and sell the seeds and cultivars in California, in the pre-legalization period, and certainly not at a profit. Based on the allegations encompassed in the FAC, it appears the MMPA, which immunized collectives and cooperatives that *provided or sold* marijuana at cost to qualified patients, was therefore either not applicable to the partnership or was not transgressed. Although the partnership intended eventually to sell the marijuana seeds and cultivars for a profit in the state, this goal was contingent on California legalizing the recreational use of marijuana and commercial marijuana sales, something that could potentially happen at any time.

As it turned out, when recreational marijuana was ultimately legalized in California, Jennings, who was the partner designated to manage the business side of the partnership, jumped ship to start his own, separate companies engaged in the sale of marijuana seeds and cultivars. Jennings's companies were eventually sold and folded into another company. Jennings remained a key player in and major shareholder of the resulting new company. The FAC alleges that Jennings obtained Almeida's seed inventory and genetic information regarding the seeds and cultivars and unilaterally gave this material to the new company, thereby providing a highly valuable asset that led to financial success for the company and for Jennings personally. The new company, which used the seed inventory to produce cultivars and seed-products for commercial sales, did not compensate Almeida (who developed the seeds and cultivars in question) and Koskiniemi (who worked to publicize the seeds and cultivars prior to legalization).

34.

Eventually, the company was sold again, resulting in a higher valuation and more gains for Jennings.

The FAC alleges that the use of the seeds and cultivars developed by Almeida and publicized by Koskiniemi has resulted in tremendous profits and financial success for Jennings and the companies with which he is associated, namely the NGW defendants. At the same time, Almeida and Koskiniemi were deprived of the valuable seed inventory and have not been compensated for the appropriation of this asset by Jennings and NGW defendants. Accordingly, Almeida and Koskiniemi brought this tort action, asserting claims of breach of fiduciary duty; conversion; misappropriation of trade secrets; unjust enrichment; fraud; violation of the Unfair Competition Law (UCL); and constructive trust as to Jennings, and claims of aiding and abetting breach of fiduciary duty; aiding and abetting conversion; misappropriation of trade secrets; unjust enrichment; violation of the UCL; and constructive trust against the NGW defendants. Almeida and Koskiniemi seek damages of "not less than $38 million" and injunctive relief to enjoin defendants from using plaintiffs' trade secrets.

Jennings and the NGW defendants contended in the trial court and again on appeal, that (1) Almeida and Koskiniemi's tort claims arise from the oral partnership agreement; (2) the oral partnership agreement was illegal; (3) the courts should not enforce the agreement because it was illegal; and (4) in light of the illegality of the underlying contract, the courts should not allow Almeida and Koskiniemi to seek relief via their instant tort claims.

Initially, Jennings and the NGW defendants have not established that the oral partnership agreement was illegal. As noted, the agreement called for the partners to publicize and brand, in the pre-legalization period, the seeds and cultivars created by Almeida as a qualified patient. Given the existence of seed/strain competitions in California in the period before recreational marijuana was legalized, it appears that many qualified patients, as well as collectives legally cultivating medicinal marijuana, were

35.

experimenting with seed strains and participated in competitions to showcase various strains. Jennings and the NGW defendants have not shown that this *object* of the contract—publicizing and branding the strains developed by Almeida—was illegal under the laws that existed at the time the contract was formed.[4]

A related and potentially longer-term *object* of the contract was to commercially market the seeds and cultivars developed by Almeida in California, *after* the legalization of recreational marijuana and commercial sales in the state. This object hinged on a subsequent change in the law—a change that could happen at any time. In other words, as to this object, the contract when it was formed, incorporated later legislation or a *subsequent change* in the law—that is legalization of recreational marijuana and commercial sales of marijuana and related products (i.e., seeds and cultivars). This contingency meant the object mandated compliance with California law. Jennings and the NGW defendants have therefore not shown that the California commercial-sales *object* of the contract was illegal at the time the contract was formed.[5] (See *Swenson v. File*, *supra*, 3 Cal.3d at p. 393 ["the parties could have … agreed to incorporate *subsequent changes* in the law" into their agreement when it was made], italics added.) Given this context (i.e., that the partnership's *objects* were not manifestly illegal), defendants have not shown, at least at this point in the proceedings, that the mere formation of the partnership was an illegal act.

_____

[4] To the extent the partnership operated in Europe, the legality or illegality of its European operations is also unclear at this stage.

[5] The trial court's ruling flagged that "the FAC states that defendant Jennings paid money in exchange for being included in the partnership. [Citation.] Further, as defendant Jennings notes, the FAC never alleges that the partnership or any of its associated limited liability companies applied for a license to cultivate, distribute, or sell cannabis, or take any concrete steps to engage in legal commerce in cannabis once the plaintiffs and the Loud Seeds entities had the opportunity to do so." However, these issues, without more, do not affect our conclusion that defendants have not shown the contract at issue had an illegal object.

Moreover, even were the contract at issue here illegal, there is ample equitable justification to enforce it based on the allegations in the FAC. In *Asdourian*, the California Supreme Court instructed that " '[i]n compelling cases, illegal contracts will be enforced in order to 'avoid unjust enrichment to a defendant and a disproportionately harsh penalty upon the plaintiff.' " (*Asdourian*, *supra*, 38 Cal.3d at p. 292; see *Kashani*, *supra*, 118 Cal.App.4th at pp. 541-542 ["Courts in California have, depending on the facts, carved out exceptions to the statutory and judicial language that illegal contracts are void and unenforceable."].)

Here, according to the FAC, Jennings and the NGW defendants are successfully and profitably engaged in commercial sales of marijuana seeds and cultivars drawn from Almeida's allegedly well-branded seed inventory, the very activities that they claim render the contract illegal and thereby bar recovery for plaintiffs. Indeed, based on the FAC, it appears Jennings actually fulfilled the object of the contract by drawing on Almeida's allegedly well-regarded seed inventory to produce and sell seed products and cultivars as soon as recreational marijuana use and commercial sales of marijuana and marijuana-related products were legalized in California. The only difference is that, rather than acting as part of the partnership, Jennings cut his partners out, appropriated the seed inventory, and formed his own, separate companies to do so, thereby maximizing his individual profits. Taking the FACs allegations as true, as we must, this appears to be the type of "compelling" case where the underlying contract, even if illegal, may properly be enforced "to 'avoid unjust enrichment to a defendant and a disproportionately harsh penalty upon the plaintiff.' "[6] (*Asdourian*, *supra*, 38 Cal.3d at p. 292.)

---

[6] *Aghaian v. Minassian*, *supra*, 64 Cal.App.5th at page 622, noted that courts will not apply the general rule against the enforcement of illegal contracts when: "(1) the public cannot be protected because the transaction has been completed; (2) no serious moral turpitude is involved; (3) the defendant is the one guilty of the greatest moral fault; and (4) to apply the rule will permit the defendant to be unjustly enriched at the expense of the plaintiff." Here, the transaction at issue is over and done with, with Jennings and

Moreover, the remedies sought by plaintiffs—damages, injunctive relief, constructive trust—do not implicate or require the court to order, any illegal conduct. (See *Mann*, *supra*, 2016 U.S. Dist. Lexis 152125 *23-24 ["even where contracts concern illegal objects, where it is possible for a court to enforce a contract in a way that does not require illegal conduct, the court is not barred from according such relief"].) These remedies relate to the allegedly tortious conduct of Jennings and the NGW defendants, the entirety of which conduct occurred *after* the legalization of recreational marijuana and commercial sales of marijuana and related products. As noted, according to the FAC, Jennings and the NGW defendants are using Almeida's seed inventory to create and sell seed products and cultivars. Almeida and Koskiniemi seek, via the tort claims in the FAC, compensation for these *post-legalization actions* taken by Jennings and NGW defendants. *They do not seek specific performance of the disputed contract.* Regardless of the legality or illegality of the disputed contract, it is reasonable to assume that Jennings and the NGW defendants will continue with the challenged actions and to profit from them. Thus, deeming the contract to be void or unenforceable would not further public policy or protect the public but would unjustly enrich the defendants while exacting a forfeiture from plaintiffs. These circumstances militate in favor of enforcing the contract for equitable reasons, even if it were to be deemed illegal.

### F.     Conclusion

The trial court determined the contract at issue here was illegal and further that it was not enforceable for equitable reasons. The trial court sustained defendants'

the NGW defendants in control of the seed inventory. Further, defendants will not be heard to say that the object of the contract implicated moral turpitude when defendants themselves are actually leveraging and profiting from, the exact same things as the partnership was set up to do (harnessing pre-legalization branding to fuel post-legalization commercial sales)—as alleged in the FAC. On the contrary, in light of the allegations in the FAC, Jennings and his companies would appear to be guilty of the greatest moral fault. And finally, the FAC alleges in detail, that defendants have been unjustly enriched at the expense of plaintiffs.

demurrers because it next found that "each cause of action is enmeshed in the parties' illegal cannabis business and cannot be extricated." We conclude, on the contrary, that defendants have not shown the contract at issue is illegal and, moreover, even if illegal, it is nonetheless enforceable on equitable grounds. The trial court's sustainment of defendants' demurrers on grounds that "each cause of action is enmeshed in the parties' *illegal* cannabis business and cannot be extricated," is therefore reversed. (Italics added.) The claims in Almeida and Koskiniemi's FAC are, in turn, resuscitated. Given this outcome, plaintiffs' claim that the trial court erred in disregarding a substantial portion of their opposition papers below is rendered moot.

## II. Miscellaneous Issues Raised By Jennings and The NGW Defendants

### A. *Standing*

Jennings and the NGW defendants, in their respective responsive briefs, make a few affirmative arguments, albeit in a cursory fashion, regarding standing and the sufficiency of certain claims in the FAC.[7] First, they challenge Almeida and Koskiniemi's standing to bring the tort claims asserted in the FAC. Jennings and the NGW defendants' respective arguments on standing are cursorily sketched in just a few short paragraphs in each of their briefs. In addition to being inadequately developed, their respective standing arguments are conflicting.

Jennings, for his part, notes that the FAC "alleged that the Loud Seed Entities were formed to undertake the business of the [partnership]." Jennings argues as to standing: "It is clear that the Appellants alleged that [the] Loud Seed Entities, which were legally separate entities from Appellants, were the entities that owned Loud Seeds' seeds and intellectual property at the time of the failed purchase of the Loud Seeds assets

---

**7** Almeida and Koskiniemi suggest that Jennings and the NGW defendants have waived their ability to make affirmative arguments on appeal by failing to file their own appeal. (See *Celia S. v. Hugo H.* (2016) 3 Cal.App.5th 655, 665 [respondent who failed to file his own appeal seeking affirmative relief forfeits appellate claims].) We have nonetheless addressed the claims at issue.

by the NGW Entities."[8]  Jennings adds:  "Accordingly, any claims based on those assets, including but not limited to the conversion, fraud, and misappropriation of trade secrets claims, were not Appellants' claims at all, but were rather the claims of the Loud Seeds Entities.  Thus, the Court should dismiss all of the claims that are properly those of the Loud Seeds Entities, and not those of Appellants."[9]

As for the NGW defendants, with regard to standing, they argue:  "In the FAC, Appellants allege they formed an oral partnership agreement that would 'build the Loud Seeds brand around the proprietary cannabis seed strains legally developed by Almeida.' … Appellants have, therefore, defined the Loud Seeds brand *and* intellectual property— the marijuana strains—as property of the partnership and not Appellants' individual property."  The NGW defendants further contend:  "The partnership—and not the Appellants—would be the real party in interest on any claim belonging to the [partnership] entity, which will include any claim resulting from the misuse or misappropriation of its property."  The NGW defendants add:  "Appellants consequently do not own their tort claims.[10]  The partnership that they allegedly formed in 2008, via the oral partnership agreement, owns the Loud Seed brand and intellectual property.  Because the partnership owns the tort claims, the individual Appellants lack standing to

---

**8** As discussed on page 7 of this opinion, *ante*, the entities referenced here are Loud Seeds, LLC; Loud Holdings, LLC; and Loud Farms, LLC.  The FAC alleges that, in October 2015, "in preparation for the legalization of adult use cannabis in California, Jennings (along with Koskiniemi's wife) oversaw the formation of Loud Seeds, LLC, Loud Holdings, LLC (Loud Holdings), and Loud Farms, LLC," under the laws of California.  The FAC further alleges:  "Although Almeida, Koskiniemi, and Jennings did not enter into operating agreements for the new entities at that time, the parties understood and agreed that these entities, their property, and their assets would fall under the larger umbrella of their oral partnership agreement."

**9** Jennings apparently wants this court to independently undertake the task of determining which of the FAC's causes of action are encompassed in his argument.  The court declines to do so.

**10** The NGW defendants, like Jennings, fail to specify precisely which claims are targeted by their argument.

prosecute any tort claims that are inextricably intertwined with the unenforceable and illegal contract."[11]

Almeida and Koskiniemi respond to the foregoing standing arguments by pointing out that while "the 'general rule' is 'a partner may not sue his copartner in an action at law in respect to firm transactions,' " there is a " 'well established' exception 'where the wrongful acts complained of … constitute a tort' that 'not only terminates the partnership but wrongfully destroys it, and … the erring partner converts to his own use its entire assets.' " (See *Barlow v. Collins* (1958) 166 Cal.App.2d 274, 278 [citing authorities].) Almeida and Koskiniemi assert that the allegations in the FAC posit that Jennings had destroyed the partnership and converted its assets. They state (quoting *Gherman v. Colburn* (1977) 72 Cal.App.3d 544, 557): "Because Jennings 'exclude[d] the other [partners], repudiate[d] the very existence of the partnership and convert[ed] all of the partnership assets, the victim[s]'—Appellants—'may sue for damages.' " (See *Navarro v. Perron* (2004) 122 Cal.App.4th 797, 802 ["the nonbreaching partner may sue for damages" "where one of the partners repudiates the existence of the partnership and converts all of the partnership assets"].)

Almeida and Koskiniemi also address Jennings's claims that the Loud Seeds entities "were formed to undertake the business of the [partnership]" and so those corporate entities owned the tort claims regarding the intellectual property at issue in this case. Specifically, Almeida and Koskiniemi respond: "In California, partners may sue in their individual capacity where, as here, the 'corporate form was a mere agency for carrying out [the] partnership.' " (See *NTD Architects v. Baker* (S.D. Cal. 2013) 950 F.Supp.2d 1151, 1156 [applying Cal. law]; accord, e.g., *Elsbach v. Mulligan* (1943) 58 Cal.App.2d 354, 369-370 [a partner "may sue at law for damage" "in [his] own name"

---

**11** In a footnote, the NGW defendants add one sentence to the effect: "The claims belong to Loud Seeds, LLC because the partnership would have merged into the corporation." We disregard this point. (See *Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 419-420 [courts need not address arguments made in footnotes].)

41.

where the "corporation … is a mere agency for the purpose of convenience in carrying out" the parties' agreement].)

In light of the allegations in the FAC and the authorities cited by Almeida and Koskiniemi, we conclude Jennings and the NGW defendants' standing arguments fail.

### B.    *Additional Issues*

Jennings next challenges the sufficiency of some, but not all, of the claims alleged against him in the FAC.  Specifically, Jennings asserts that the "misappropriation of trade secrets [cause of action] fails to state a claim" and that "unjust enrichment and constructive trust are potential remedies and not independent claims."  (Some capitalization omitted.)  However, since Jennings thereby concedes that the remaining claims against him *are* legally sufficient—i.e., breach of fiduciary duty, conversion, fraud, and violation of the unfair competition law—we need not address his arguments as to the sufficiency of the trade secrets, unjust enrichment, and constructive trust claims.  (See *Genesis*, *supra*, 113 Cal.App.4th at p. 608 [once the appellate court determines a complaint "has stated *a cause of action* under one legal theory and thus survived the general demurrer, we need not address the sufficiency of the allegations to state any *other* causes of action"], italics added.)

Like Jennings, the NGW defendants also challenge the sufficiency of some of the claims asserted against them in the complaint.  For example, the NGW defendants challenge the sufficiency of the aiding and abetting breach of fiduciary duty claim and the aiding and abetting conversion claim.  The NGW defendants state:  "To establish their aiding and abetting claims, Appellants must allege facts showing that the NGW Respondents made 'a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act.'  (*Am. Master Lease LLC v. Idanta Partners, Ltd*. (2014) 225 Cal.App.4th 1451, 1477.)"  The NGW defendants contend:  "Appellants do not allege that NGW Respondents 'acted with the intent of facilitating the commission of [the underlying] tort,' or 'with knowledge of the object to be attained.'

42.

(*Casey v. U.S. Bank [Nat. Assn.]* (2005) 127 Cal.App.4th 1138, 1146.)" In short, the NGW defendants dispute the adequacy of allegations to show that they "knew Jennings was allegedly breaching any duty" or unlawfully converting property. They posit the aiding and abetting claims are therefore insufficient.

Almeida and Koskiniemi respond that the NGW defendants "ignore numerous specific allegations [in the FAC] of [the requisite] knowledge: (1) their draft purchase agreement 'recognized that there were "three partners with equal interest" in Loud Seeds—Almeida, Koskiniemi, and Jennings'[s] [citations]; (2) 'the NGW Defendants knew Jennings did not have the authority to execute' the purported Assignment of the partnership's inventory of cannabis seeds, yet they accepted the seeds anyway [citations]; (3) '[t]he NGW Defendants were aware of Jennings'[s] … breach of [his] fiduciary duty, through their communications with Plaintiffs during the negotiations of a potential sale of Loud Seeds to NGW Holdings and … due diligence on such transaction' [citations]; and (4) they knew of the conversion by imputation, through knowledge by their then-Director Jennings [citations]." We agree that the allegations in the FAC are sufficient to show, with respect to the claims for aiding and abetting breach of fiduciary duty and aiding and abetting conversion, that the NGW defendants acted to aid and abet Jennings "with knowledge of the object to be attained" (that is, the improper takeover of the seed bank). (*Casey v. U.S. Bank Nat. Assn.*, *supra*, 127 Cal.App.4th at p. 1146.) We conclude the aiding and abetting claims in the FAC are sufficiently pleaded.

In light of our conclusion, we need not address the NGW defendants' contentions challenging the sufficiency of the remaining claims against them in the FAC. (See *Genesis*, *supra*, 113 Cal.App.4th at p. 608 [once the appellate court determines a complaint "has stated *a cause of action* under one legal theory and thus survived the general demurrer, we need not address the sufficiency of the allegations to state any *other* causes of action"], italics added.)

43.

**DISPOSITION**

The judgment of dismissal is reversed. The matter is remanded with instructions to the trial court to vacate the order sustaining defendants' respective demurrers without leave to amend and to enter a new order overruling the demurrers. Koskiniemi and Almeida shall recover their costs on appeal.

SMITH, J.

WE CONCUR:

DETJEN, Acting P. J.

MEEHAN, J.